# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# (WESTERN DIVISION)

| | |
|---|---|
| **ANNETTE JORDAN,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**KROLL FACTUAL DATA,** )<br>**INC., BLUESTEM BRANDS,** )<br>**INC. and WEBBANK,** )<br>)<br>Defendants. ) | CIVIL ACTION NO.<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### PRELIMINARY STATEMENT

COMES NOW Plaintiff Annette Jordan ("Ms. Jordan" or "Plaintiff"), and files her Complaint, and with knowledge as to her own acts, upon information and belief and investigation of counsel as to the acts of others, believing such allegations have evidentiary support after a reasonable opportunity for further investigation or discovery alleges as follows:

1. This is an action for damages brought by an individual consumer, Ms. Jordan, against Defendants Kroll Factual Data, Inc. ("Kroll"), Bluestem brands, Inc. ("Bluestem") and WebBank ("Web") (collectively referred to throughout the

Complaint as "Defendants") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.,* as amended.

2. Defendants have been reporting false information about Ms. Jordan to third parties. More specifically, Defendants have been reporting Ms. Jordan as deceased. The reporting is false because Ms. Jordan is not deceased.

3. When a consumer reporting agency reports a living consumer deceased, Defendants make it practically impossible for that consumer to access credit, as it did with Plaintiff.

4. Kroll's practices also harm the business that purchase its credit reports; as such companies cannot process credit applications due to the applicant's lack of a credit score. There is no good faith rationale to explain Kroll's practice other than a generation of revenue. If Kroll actually believed Plaintiff was deceased, it had no legally permissible basis to sell Plaintiff's credit report. If Kroll believed Plaintiff was alive, Kroll knowingly sold Plaintiff's credit report with a gross inaccuracy.

5. Further, Kroll knows that identity thieves use the credit information of truly deceased persons to commit credit fraud.

6. Bluestem and Web were notified by a consumer reporting agency that Ms. Jordan disputed the deceased status.

7. Thereafter, Bluestem and Web "verified" Ms. Jordan was deceased to at least one consumer reporting agency.

8. Defendant's violated Plaintiff's rights under the FCRA as detailed below.

## JURISDICTION AND VENUE

9. Jurisdiction of this Court arises under 15 U.S.C. § 1681p, 28 U.S.C. §§ 1331 and 1337.

10. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

11. Ms. Jordan, is an adult individual who resides in Eutaw, Alabama.

12. Defendant Kroll is a foreign corporation with its principal place of business, upon information and belief, in the state of Colorado. Kroll does business in this judicial district. Kroll is a consumer reporting agency ("CRA") as defined by 15 U.S.C. 1681a(f) and a reseller of credit information.

13. Defendant Bluestem is a person who furnishes information to consumer reporting agencies as defined by 15 U.S.C. § 1681a(f). In all respects and at all times relevant herein, Bluestem was doing business in this judicial district.

14. Defendant Web is a person who furnishes information to consumer reporting agencies as defined by 15 U.S.C. § 1681a(f). In all respects and at all times relevant herein, Bluestem was doing business in this judicial district.

## FACTUAL ALLEGATIONS

15. Kroll is regulated as a "consumer reporting agency" ("CRA") under the FCRA 15 U.S.C. §§ 1681a(e) and (s).

16. Kroll sells consumer reports (commonly referred to as "credit reports" or "reports") and also sells credit scores.  15 U.S.C. § 1681a(f).

17. Pursuant to the FCRA, Kroll must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy."  15 U.S.C. § 1681e(b).

18. Pursuant to the FCRA, Kroll must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."  15 U.S.C. §§ 1681e(a) and 1681b.

19. Kroll places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

20. The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

21. Kroll does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

22. Kroll does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

23. Kroll does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

24. A deceased notation is a very unusual marking upon a credit file or credit report.

25. Kroll has no procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Kroll to be placed in said consumer's credit report.

26. Kroll could, but chooses not to, obtain the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. Thus, Kroll does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

27. Indeed, Kroll employs no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

28. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Kroll employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

29. Once a "deceased" mark is placed upon a consumer's report, Kroll will not calculate and will not provide a credit score for that consumer.

30. Nevertheless, Kroll routinely sells to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

31. Upon Kroll's reports with a "deceased" mark sold to third parties Defendant never calculates or provides a credit score for that consumer.

32. Kroll knows that third party credit issuers use a credit score in order to process a given credit application.

33. Kroll knows that many third party credit issuers require a credit score in order to process a given credit application.

34. Kroll knows that consumers without credit scores are unable to secure any credit from most credit issuers.

35. Kroll knows that living consumers are turned down for credit specifically because Kroll is reporting them as "deceased" and without a credit score.

36. Kroll has been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Kroll is reporting them as "deceased" and without a credit score.

37. Kroll has received and documented disputes from consumers complaining that their credit report had them erroneously marked as "deceased."

38. Kroll knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

39. Nevertheless, Kroll employs no procedures which assure that a consumer marked as "deceased" on one of Kroll's reports is, in fact, deceased.

40. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

41. Defendant has no independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

42. Nor does Kroll employ any procedures to limit or stop the furnishing of reports to third parties for consumers which they have marked as "deceased" under any circumstances.

43. For years after a consumer's actual death, Kroll will continue to sell credit reports about that consumer.

44. Kroll charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

45. Kroll profits from the sale of reports on the deceased.

46. Kroll knows that truly deceased consumers do not apply for credit.

47. Kroll knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud.  Indeed, identity theft using the personal identifying information of deceased consumers is known to Kroll to be a common and major source of identity theft.

48. Kroll knows that identity theft and credit fraud are serious and widespread problems in our society.

49. Kroll has no death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

50. Indeed, Kroll sells reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

51. For consumers who are deceased, there exists no permissible purpose under the FCRA for Kroll to ever sell their credit reports, absent a court order.

52. Kroll knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

53. Ms. Jordan has been marked by Defendants as "deceased" on her credit reports since at least May 2015.

54. Plaintiff is not deceased.

55. Kroll did not calculate or provide any credit score for or on Plaintiff, even though it sold at least one consumer report about her to third parties marking her as "deceased."

56. Plaintiff was declined credit for a home loan in May, 2015.  The sales person informed Plaintiff that she could not be approved for a loan because she was reported as deceased on her credit report.

57. Prior to sale of its consumer report about Plaintiff, Kroll did nothing to investigate the information received regarding the deceased notation.

58. Notwithstanding the inconsistent reporting of the deceased notation, Kroll sold a consumer credit report about the Plaintiff that included the deceased notation.

59. Ms. Jordan made a dispute to Equifax about the account being reported by Bluestem and Web that indicated she was deceased.

60. Equifax provided notice of Ms. Jordan's dispute to Bluestem and Web.

61. Bluestem and Web "verified" the FingerHut account ending in 0709 was reported correctly, including reporting Ms. Jordan as deceased.

62. Bluestem and Web did not contact Plaintiff and request additional information concerning Plaintiff's dispute.

63. Bluestem and Web did not contact third parties for additional information concerning Plaintiff's dispute.

64. Bluestem and Web did not review underlying account documents in response to notice of Plaintiff's dispute from Equifax.

65. Bluestem and Web did not contact third parties for additional information concerning Plaintiff's dispute.

66. Bluestem and Web did not conduct a reasonable investigation of Plaintiff's dispute.

67. Plaintiff has suffered actual damages in the form of lost credit opportunities, credit defamation, out of pocket expenses, interference with normal and usual activities, invasion of privacy, and emotional distress, including anxiety, frustration, humiliation and embarrassment as a result of Defendants' conduct.

68. At all times pertinent hereto, Defendants were acting by and through its agents, servants and/or employees who were acting within the course and scope of its agency or employment, and under the direct supervision and control of the Defendants herein.

69. At all times pertinent hereto, the conduct of Defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## COUNT ONE – VIOLATIONS OF THE FCRA
## (Plaintiff v. Kroll)

70. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

71. At all times pertinent hereto, Kroll was a "person, consumer reporting agency" and "reseller" as those terms are defined by 15 U.S.C. §§ 1681a(b), (f) and (s).

72. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

73. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

74. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Kroll is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. § 1681e(b).

75. The conduct of Kroll was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Kroll is liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

### COUNT TWO – VIOLATIONS OF THE FCRA
### (Plaintiff v. Bluestem)

76. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

77. At all times pertinent hereto, Bluestem was a "person" as that terms are defined by 15 U.S.C. § 1681a(b).

78. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

79. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Bluestem is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a furnisher of information pursuant to 15 U.S.C. § 1681s-2(b).[1]

80. The conduct of Bluestem was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Bluestem is liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

### COUNT THREE – VIOLATIONS OF THE FCRA
### (Plaintiff v. Web)

81. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

82. At all times pertinent hereto, Web was a "person" as that term is defined by 15 U.S.C. § 1681a(b).

83. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

---

[1] Plaintiff is not making a claim against Bluestem under 15 U.S.C. § 1681s-2(a).

84. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Web is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a furnisher of information pursuant to 15 U.S.C. § 1681s-2(b)[2].

85. The conduct of Web was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Web is liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## JURY TRIAL DEMANDED

86. Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against Defendants as follows:

Count One:

    (a)    Actual damages;

    (b)    Statutory damages;

    (c)    Punitive damages;

---

[2] Plaintiff is not making a claim against Web under 15 U.S.C. § 1681s-2(a).

(d) Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o; and

(e) Such other and further relief as may be necessary, just and proper.

Count Two:

(a) Actual damages;

(b) Statutory damages;

(c) Punitive damages;

(d) Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o; and

(e) Such other and further relief as may be necessary, just and proper.

Count Three

(a) Actual damages;

(b) Statutory damages;

(c) Punitive damages;

(d) Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o; and

(e) Such other and further relief as may be necessary, just and proper.

Dated:       March 24, 2016

>Respectfully submitted,
>
>**/s/ Micah S. Adkins**
>Micah S. Adkins (ASB-8639-I48A)
>**THE ADKINS FIRM, P.C.**
>301 19th Street North, Suite 581
>Birmingham, Alabama 35203
>Telephone:  205-458-1204
>Facsimile:  205-208-9632
>Email:       MicahAdkins@ItsYourCreditReport.com